Kimber EDWARDS, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 86895.

Supreme Court of Missouri,
En Banc.

Aug. 8, 2006.

As Modified on Denial of Rehearing
Sept. 26, 2006.

Melinda K. Pendergraph, Office of the Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Evan J. Buchheim, Asst. Atty. Gen., Jefferson City, for Respondent.

MICHAEL A. WOLFF, Chief Justice.

Kimber Edwards was convicted of hiring Orthel Wilson to kill his ex-wife, Kimberly Cantrell, and was sentenced to death. This Court affirmed. *State v. Edwards*, 116 S.W.3d 511 (Mo. banc 2003), *cert. denied*, 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004). Edwards filed a postconviction motion pursuant to Rule 29.15, which was overruled after a partial hearing. Edwards now appeals. Because Edwards was sentenced to death, this Court has jurisdiction. Mo. Const. art. V, sec. 10; order of June 16, 1988.

**Facts**

Edwards and Cantrell were divorced in 1990. Edwards was ordered to pay child support for the couple's daughter. Edwards fell behind in his payments and did not pay support from March 1999 to March 2000. He was indicted on a felony non-support charge. Cantrell was listed as a witness. A scheduling conference was set for August 25, 2000.

Edwards worked as a correctional officer in St. Louis County and also owned several apartments with his second wife, Jada. In the summer of 2000, Orthel Wilson was living in one of these apartments rent-free in exchange for maintenance and other work. Edwards was seen at Wilson's apartment during the week preceding Cantrell's murder. Sometime in the month before the murder, Wilson's brother saw a .38 caliber handgun in Wilson's bedroom. Edwards told Wilson to put the gun away. Wilson's brother later identified the gun as similar to the gun used to murder Cantrell.

The afternoon of the murder, August 22, 2000, Cantrell's neighbor, 14–year–old Christopher Harrington, saw a man, whom he later identified as Wilson, carrying a black backpack, knocking on Cantrell's door. Wilson's roommate testified that he dropped Wilson off near Cantrell's apartment at approximately 4:30 that afternoon. Between 5:15 and 5:30 that evening, Harrington's 12–year–old brother heard gunshots and the sound of a woman screaming coming from Cantrell's apartment.

Cantrell's body was discovered, shot twice in the head, on the evening of August 23. Detectives visited Edwards' home in the early morning of August 24 to see if he had any information that might aid the investigation. Edwards agreed to go to the police station. Detectives drove Edwards, Jada, and Edwards' three daughters to the station. Edwards stated that he did not kill Cantrell and did not know who would want her dead. Cantrell's daughter—who was the only child of Cantrell's marriage to Edwards—was placed in an aunt's custody, and the remaining family members were driven home.

A few days later, detectives went to Edwards' apartment building to interview the tenant that Edwards claimed to be helping with an electrical problem on the day of the murder. Detectives saw Wilson sitting on the steps in front of the building and approached him because he matched the description of the person knocking on Cantrell's door. He agreed to go to the

police station. In Wilson's apartment, detectives found a black backpack matching the backpack described by Christopher Harrington. From a photographic lineup, Harrington identified Wilson as the man he saw. Wilson was charged with first-degree murder.

The next day, Wilson took the police to a vacant house where they located the murder weapon and some ammunition. Edwards was interviewed again later that day. Edwards confessed that he had agreed to pay an individual named "Michael" $1600 to kill Cantrell. Edwards said he gave Cantrell's address and routine to "Michael," and that he told "Michael" that he could get a key to Cantrell's apartment. Edwards said he told "Michael" that he wanted Cantrell dead before a scheduled appearance in the non-support case. Edwards denied that "Michael" was really Wilson, but stated that he thought "Michael" might have involved Wilson in the operation. Edwards made a written statement detailing this information.

Wilson did not testify at trial. Some police officers, however, testified about their interactions with Wilson, specifically that Wilson had led officers to the murder weapon and that Wilson's statements were used to confront Edwards during his second interrogation.

Edwards testified at trial and denied any involvement with Cantrell's murder, although he did admit making a statement implicating himself. Edwards claimed that he only made the statement because he was afraid that the police would bring his wife and daughters to the station again and would accuse his wife of involvement in the murder.

The jury found Edwards guilty of first-degree murder.

During the penalty phase, Edwards presented nine witnesses who were family, friends, and co-workers. The defense strategy was to present Edwards as a hard worker who loved his family, treated his co-workers and tenants well, and was close to and loved by his family. The defense wanted to show that Edwards' family would be hurt by his execution. Edwards' mother, Mildred, testified that Edwards had a "good relationship" with his deceased father, was close to his father, and was a hard worker. She testified that Edwards was a good parent and treated her foster children like his own brothers and sisters. Many witnesses testified that they loved Edwards and would continue to visit him in jail. The jury found one aggravating circumstance: that Edwards hired another person to murder Cantrell. The jury recommended the death penalty, which the trial court imposed.

**Post–Conviction Evidence**

Edwards then filed a Rule 29.15 motion. The motion court held an evidentiary hearing on several issues but denied relief.

Edwards' mother, Mildred, testified at the Rule 29.15 hearing about Edwards' childhood. This testimony conflicted with Mildred's testimony during the penalty phase at trial, where she had stated that Edwards had a good relationship with his father. During the penalty phase, Mildred did not mention any problems with abuse or neglect in the home while Edwards was growing up. At the Rule 29.15 hearing, however, she testified that her husband, Emmrie, continually beat and abused her throughout the marriage. She testified that Emmrie did not show any interest in or affection for any of the children. When she was pregnant with Kimber, she did not receive prenatal care, was beaten by Emmrie, and had a high fever at one point during the pregnancy. When Kimber was a baby, he did not cry or respond normally. Mildred was hospitalized for depression when Kimber was a child. Mildred

testified that Emmrie would wake the children up at night to beat them and that Kimber would not cry, run away, or complain. She testified that when Emmrie would beat her, Kimber would act like nothing was happening.

Edwards' attorneys called his cousin, Tangalayer Mansaw, who did not testify at trial. Mansaw testified at the Rule 29.15 hearing that she was never contacted by Edwards' trial counsel or their investigator. Mansaw spent a lot of time at Edwards' house when she was a child and testified that she witnessed extensive domestic violence incidents between Edwards' parents.

Both of Edwards' trial counsel testified that they had difficulty communicating with Edwards in preparation for trial. Edwards would focus on minute details that he wanted accomplished without seeing the big picture. When counsel would not do something he wanted, Edwards would not cooperate, would withhold information, and would threaten to tell his family not to talk to counsel. Edwards' counsel on direct appeal also testified that Edwards was difficult to communicate with.

Edwards tried to have both his trial and post-conviction counsel removed because he was dissatisfied with their performance. In both instances, the court found that his counsel was adequate and refused to appoint new counsel.

**Expert Evaluations and Testimony**

Trial counsel had Edwards evaluated by three experts prior to trial: Doctors Cross, Stacey, and Rabun. The purpose of these evaluations was to determine whether Edwards was competent to stand trial and whether he had any mental disease or defect that could provide a defense or significant mitigating evidence. These experts met with Edwards and family members, conducted testing on Edwards, and reviewed school, work, and medical records. None of these experts concluded that Edwards was incompetent to stand trial or that he had a mental disease or defect that could provide a defense. Dr. Cross did mention to trial counsel that he thought Edwards might have an unspecified developmental disability.

The three experts who testified as part of the Rule 29.15 hearing were Dr. Logan, a psychiatrist, Dr. Draper, a developmental specialist, and Dr. Cross, a clinical psychologist. All three agreed that Edwards showed signs consistent with Asperger's Disorder,[1] a developmental disorder that is related to, but separate from, autism. Prior to the Rule 29.15 evaluations, no one had ever diagnosed Edwards with Asperger's Disorder. His school records did not indicate any serious developmental problems.

Dr. Draper, a "developmentalist" and professor with a Ph.D., testified that Edwards "has the characteristics of" Asperger's Disorder, but did not make a diagno-

---

1. According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (2000) (DSM–IV), Asperger's Disorder, sometimes referred to as Asperger's syndrome, is characterized by impaired social interaction combined with intense preoccupation with certain interests or objects. Although it is related to autism, the social impairment involved with Asperger's Disorder is less severe. People with Asperger's are often of above-average intelligence and do not have any sig-

nificant delay in the development of language skills. People with Asperger's often have difficulty forming reciprocal relationships. They have difficulty listening to other people and may not understand or use normal body language or gestures. Unlike people with autism, who isolate themselves, people with Asperger's are often interested in pursuing relationships with others, but do so in a one-sided or insensitive manner.

sis of Asperger's. Dr. Draper wrote her report after interviewing Edwards and family members and reviewing records.

Dr. Cross evaluated Edwards both prior to and after trial. He has a Ph.D. and is a licensed psychologist in Missouri. Dr. Cross did not diagnose Asperger's Disorder or any other condition prior to trial.

At the Rule 29.15 hearing, Dr. Cross testified that when he evaluated Edwards prior to trial, he had been provided with school and work records and police reports. He was not provided with a formal social history, but he believes that a social history is essential to a proper evaluation. Although Dr. Cross said that trial counsel stated their intention to send him birth and medical records, he did not receive them. He never requested the records from counsel, even though counsel's letter requested that he contact them if he needed any additional information. He never requested a more detailed social history. He interviewed Mildred (Edwards' mother), Jada (Edwards' second wife), one of Edwards' daughters, and Edwards. During these pretrial interviews, Mildred stated that Edwards' development was normal and that he did not have any problems in school. Mildred did not provide details about domestic violence in the home. Mildred mentioned that she had suffered from depression but did not elaborate on the extent or cause. Dr. Cross did not receive Mildred's medical records, nor did he request them from counsel.

As part of his pretrial evaluation, Dr. Cross administered several intelligence and personality tests. Edwards' verbal I.Q. was 115, but his performance I.Q. was only 90. Dr. Cross testified that this spread indicated "a developmental learning disability" and that he mentioned this suspicion to Edwards' trial attorneys. The testing did not show that Edwards had a major mental illness or indicate that Edwards had been abused as a child.

After he reported his initial results, Dr. Cross was notified that trial counsel did not want him to submit a formal report. He was later contacted by post-conviction counsel and asked to interview Edwards again and give an opinion. Dr. Cross testified that the social history provided by post-conviction counsel contained important information that was useful in diagnosing Edwards.

After trial, Dr. Cross interviewed Mildred several more times, and she gave information contrary to her pretrial interviews. This information included details about Edwards' lack of attachment and failure to play with other children, as well as details about the abuse within the home. Dr. Cross did not believe that it would have been possible to elicit this information from Mildred before trial because "it was very difficult for Mildred to emotionally manage that kind of disclosure" at that time.

Before he had reviewed all of the records from post-conviction counsel, Dr. Cross attended a meeting with Drs. Draper and Stacey and post-conviction counsel. The purpose of that meeting was to "theorize a little bit about what might be a possible diagnosis" for Edwards. Dr. Cross did not remember who first mentioned the diagnosis of Asperger's, but was sure that he did not raise it. Dr. Cross suggested that counsel retain a psychiatrist because "I wanted someone who could confirm my diagnosis[.]" In reaching his diagnosis, Dr. Cross also relied on the written report of Dr. Stacey, who was consulted both before and after trial but who did not testify. Dr. Stacey's diagnosis was a pervasive developmental disorder not otherwise specified, with a secondary diagnosis of narcissistic personality. Dr. Cross testified that this diagnosis, although not identical, was "consistent" with his diagnosis of Asperger's.

Dr. Logan, a psychiatrist, was the last post-conviction expert consulted. At the time he was consulted, "there had already been a meeting ... that had formed a diagnostic impression that Mr. Edwards suffered from some type of pervasive developmental disorder, primarily Asperger's Disorder." Dr. Logan believed that "there had been some suggestion ... that they get a psychiatrist to take a look at things." Dr. Logan's job was to determine whether he agreed with that diagnosis and to determine how that diagnosis might have affected Edwards' participation in his trial. Dr. Logan concluded that Edwards suffered from Asperger's Disorder. Dr. Logan did not conduct his own interviews of Mildred and did not prepare his own social history.

Dr. Logan believed that the diagnosis of Asperger's Disorder would have been mitigating evidence at trial because it would have explained Edwards' demeanor and occasional inappropriate facial expressions, as well as his inability to work out problems in collaboration with others.

### Standard of Review

▆▆▆▆ This Court reviews a motion court's judgment overruling a post-conviction motion for clear error. Rule 29.15(k); *Morrow v. State,* 21 S.W.3d 819, 822 (Mo. banc 2000). "Findings and conclusions are clearly erroneous only if a full review of the record definitely and firmly reveals that a mistake was made." *Id.* The motion court's findings of fact and conclusions of law are presumed to be correct. *Wilson v. State,* 813 S.W.2d 833, 835 (Mo. banc 1991).

### Exclusion of evidence of accomplice's sentence

▆▆ Edwards' first point on appeal is that his appellate counsel was ineffective for failing to challenge the trial court's exclusion of evidence that Wilson was sentenced to life imprisonment.

The trial court refused to allow evidence of Wilson's sentence during Edwards' penalty phase. Edwards claims that this evidence was admissible and that his appellate counsel should have raised it under *Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). Appellate counsel testified that she was aware of *Parker* but that she raised the issue as only one of proportionality; that is, she argued that Wilson's sentence should have been raised as part of the determination whether Edwards' death sentence was proportional to the crime. She testified that, looking back, she wishes that she had raised the claim under *Parker.*

Two relevant cases, *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *State v. Schneider,* 736 S.W.2d 392 (Mo. banc 1987), precede *Parker.* In *Lockett,* the Supreme Court held that the sentencer in a capital case cannot be prevented from considering, in mitigation, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." [2] 438 U.S. at 604, 98 S.Ct. 2954. A capital defendant has the right to an "individualized consideration" based on his particular situation. *Id.* at 605, 98 S.Ct. 2954. The Court recognized that this standard does not "limit[ ] the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604, note 12, 98 S.Ct. 2954. In *Schneider,* this Court considered

---

**2.** Although *Lockett* was a plurality opinion, its holding has been adopted by a majority of the Supreme Court and applied in numerous subsequent cases. *See, e.g., Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

whether the exclusion of evidence of a co-defendant's plea agreement and sentence violated *Lockett.* 736 S.W.2d at 396. This Court held that it did not, because the co-defendant's plea agreement "did not pertain to *defendant's* character or prior record, and while [the co-defendant's] activities in the crime were relevant to the 'circumstances of the offense,' the bargain he struck with the prosecutor subsequent to the murders was not." *Id.* at 397 (emphasis in original).

Although *Schneider* would seem to settle the issue by holding that the admission of a co-defendant's sentence is not required mitigating evidence under *Lockett,* Edwards argues that the Supreme Court's decision in *Parker* changed this result. In *Parker,* the court construed the Florida death penalty statute, which, like Missouri's statute, requires the sentencer to weigh any aggravating factors found against all of the mitigating evidence presented. Part of the mitigating evidence presented under Florida law was that none of Parker's accomplices were sentenced to death. 498 U.S. at 314, 111 S.Ct. 731. It was not clear to what extent the trial judge had considered the mitigating evidence presented. *Id.* The Florida Supreme Court invalidated two of the aggravating factors, but did not invalidate the sentence, because it found that "no mitigating factors" had been found by the trial court. *Id.* at 318–19. The Supreme Court invalidated Parker's death sentence because "[a]fter striking two aggravating circumstances, the Florida Supreme Court affirmed Parker's death sentence without considering the mitigating circumstances. This affirmance was invalid because it deprived Parker of the individualized treat-

ment to which he is entitled under the Constitution." *Id.* at 322, 111 S.Ct. 731.

Edwards argues that *Parker* stands for the proposition that a co-defendant's sentence is required mitigating evidence that the jury must consider. The state argues that *Parker* holds only that the Florida appellate court could not uphold Parker's death sentence after invalidating an aggravating factor without reweighing the aggravating and mitigating factors.

This Court agrees with the state's interpretation. *Parker* holds that any mitigating evidence that is admitted under state law must be considered and weighed against the aggravating factors found. The United States Supreme Court does not say that an accomplice's sentence is constitutionally required mitigating evidence; rather, the Court says that if that evidence is admitted under state law, then it must be considered by the sentencer. Other state courts have similarly interpreted *Parker.* *See, e.g., Morris v. State,* 940 S.W.2d 610, 614 (Tex.Crim.App.1996) (*Parker* does not state that this evidence must be considered by the jury; evidence of an accomplice's sentence does not relate to the defendant's character or record, or to the circumstances of the offense); *State v. Ward,* 338 N.C. 64, 449 S.E.2d 709, 737 (1994) (*Parker* only addressed Florida law and did not hold that this evidence was required to be admitted under federal law); *People v. Mincey,* 2 Cal.4th 408, 6 Cal.Rptr.2d 822, 827 P.2d 388, 434 (1992) (*Parker* does not hold that other states are constitutionally required to admit this evidence in mitigation). Edwards cites cases where evidence of an accomplice's sentence was allowed.[3] None of these cases cites a statement by the United States Supreme

---

**3.** *State v. Schurz,* 176 Ariz. 46, 859 P.2d 156, 165 (1993); *Malloy v. State,* 382 So.2d 1190, 1193 (Fla.1979) (following earlier United States Supreme Court standard rather than *Lockett* ); *In re Burgess,* 811 So.2d 617, 628 (Ala.2000); *State v. Ferguson,* 642 A.2d 1267 (Del.Super.1992); *Holmes v. State,* 671 N.E.2d 841, 850–51 (Ind.1996).

Court that this evidence is constitutionally required to be admitted. The federal courts require admission of this evidence, but that admission is based on a federal statute, 18 U.S.C. § 3592(a)(4), not on the constitution. Florida is free to allow a broader range of mitigating evidence than the constitution requires; that does not mean that Missouri must allow anything beyond what is required by *Lockett* and other Supreme Court cases.

Edwards argues that this interpretation of *Parker* is inconsistent with *McCleskey v. Kemp*, 481 U.S. 279, 306, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), where the Supreme Court held, "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the [death] penalty." That statement follows a summary of the limits that prior Supreme Court cases, including *Lockett*, have placed on the death penalty. There is no mention of overruling *Lockett*. Thus, the term "relevant" refers to the limitations imposed in *Lockett* and other cases, such as the "circumstances of the case." More recent Supreme Court cases reaffirm the states' ability to limit the mitigating evidence that can be presented and the continued viability of the *Lockett* standard. *See, e.g., Oregon v. Guzek*, —— U.S. ——, 126 S.Ct. 1226, 1231–32, 163 L.Ed.2d 1112 (2006).

Since *Parker* does not change the standard for admissibility of mitigating evidence, this Court's earlier pronouncement in *Schneider* that *Lockett* does not apply to evidence of an accomplice's sentence controls. There is no basis in Missouri law for concluding that a co-defendant's sentence is relevant as to mitigation in the penalty phase. Unless and until the United States Supreme Court rules that a co-defendant's sentence must be considered, as a constitutional matter, there is no basis for ignoring existing Missouri precedent.

The motion court's finding that appellate counsel was not ineffective on this issue is not clearly erroneous.

## Lack of opportunity to confront Orthel Wilson

█ Edwards' second point is that his right to confrontation was violated because he was not allowed to cross-examine Wilson. Wilson was not called as a witness, but police officers testified that Wilson led them to the murder weapon.

█ The Confrontation Clause, found in the Sixth Amendment to the United States Constitution, provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This clause is made applicable to the States through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). In *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause bars the admission of "testimonial" statements by a witness who does not testify at trial, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. The Court declined to decide specifically which statements are "testimonial." *Id.* Edwards argues that *Crawford*, decided after his direct appeal, should be applied retroactively to him.

█ Following *Crawford*, the Supreme Court in *Davis v. Washington*, —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), considered the definition of "testimonial" as it relates to statements made during police interrogations. Such statements are nontestimonial "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 2273–74. Statements are testimonial if the circumstances

objectively indicate no emergency "and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id* at 2274.

It is not necessary to determine whether Wilson's statements in this case would be "testimonial" under *Davis,* because none of Wilson's statements was put before the jury. The only statement that was repeated to the jury did not implicate Edwards in the crime and was not admitted for its truth. This case is unlike *Crawford,* where the witness' videotaped confession was played for the jury, and *Hammon,* the companion case to *Davis,* where police read the witness' written statement verbatim to the jury. Id. at 2272.

On direct appeal, this Court held that testimony about Wilson's statements to the police could not be admitted for their truth, but were admissible for the limited purpose of explaining the officers' subsequent investigation. *State v. Edwards,* 116 S.W.3d 511, 532–33 (Mo. banc 2003). The Court found that the testimony had been carefully restricted so that no improper statements implicating Edwards were presented. *Id.* at 533. A careful review of the record reaffirms that conclusion.

Although officers testified that Wilson was interviewed, no particular statement Wilson made during interrogation was discussed. Officers also testified that Wilson was arrested for first-degree murder based on Christopher Harrington's identification from a photographic lineup. Officers testified that Edwards wanted to revise his statement after hearing that the police had interviewed Wilson. The jury did not hear what Wilson told the police that made Edwards want to revise his statement. Officers testified that they informed Edwards that "Wilson was in custody, that we had spoken with Wilson and that we had recovered a murder weapon."

This was not a statement by Wilson. The only direct statement of Wilson's that was before the jury was in response to the question of why officers had gone to a particular building: "Mr. Wilson told us that's where he hid the murder weapon." In addition to being admitted only for the limited purpose of demonstrating why the police went to that building, this statement did not implicate Edwards in the crime.

The record shows, as this Court concluded on direct appeal, that all of the evidence was admitted for the limited—and proper—purpose of explaining subsequent police actions. *See State v. Dunn,* 817 S.W.2d 241, 243 (Mo. banc 1991) (statements explaining subsequent police conduct are admissible). The judge carefully controlled the evidence so that no witnesses were allowed to testify improperly about what Wilson had told them. Because none of Wilson's statements implicating Edwards was admitted for its truth, there was no testimonial evidence involved, and the Confrontation Clause was not implicated. Because the Confrontation Clause was not implicated, the subsequent decisions of *Crawford* and *Davis* do not change the conclusion of this Court on direct appeal that no improper hearsay was admitted.

Edwards complains that, even if the statements were properly admitted to show the reasonableness of the officers' subsequent actions, the jury was free to consider the statements for their truth because the trial court refused to give a limiting instruction. Edwards raised this issue on direct appeal and provides no basis why this issue should be reconsidered here. "Issues decided on direct appeal will not be reconsidered" in postconviction proceedings. *Leisure v. State,* 828 S.W.2d 872, 874 (Mo. banc 1992).

**Motion court's refusal to hear Orthel Wilson's Recantation**

■ In his amended Rule 29.15 motion, Edwards alleged that Wilson recanted his confession, claiming that the police coerced his confession and that Edwards did not hire him to commit the murder.

The motion court denied a hearing on this allegation. "A movant is entitled to an evidentiary hearing if (1) he alleges facts that warrant relief, if true; (2) the allegations are not refuted by the record; and (3) the movant was prejudiced by the alleged errors." *Franklin v. State*, 24 S.W.3d 686, 690 (Mo. banc 2000).

Wilson did not testify at trial. The jury did not hear any statements made by Wilson implicating Edwards. The main evidence supporting Edwards' conviction is his own confession. Even if Wilson testified to these facts, they would not warrant relief because they would not negate the basis for guilt. Edwards was not entitled to a hearing on this claim because, even if this new evidence were true, it would not warrant relief because it would not negate the significant evidence supporting Edwards' conviction.

**Motion court's failure to make findings on all issues**

For his fourth point, Edwards complains that the motion court only made specific findings of fact and conclusions of law on five of the 14 issues he pled.

■ Rule 29.15(j) states, "[t]he court shall issue findings of fact and conclusions of law on all issues presented, whether or not a hearing is held . . . .". Findings and conclusions on a post-conviction motion "must be sufficiently specific to allow meaningful appellate review." *Barry v. State*, 850 S.W.2d 348, 350 (Mo. banc 1993). The court, however, "is not required to individually address every claim brought by the movant. Generalized findings are sufficient so long as they permit the appellate court an adequate record for appellate review of movant's claims." *Franklin v. State*, 24 S.W.3d 686, 692 (Mo. banc 2000). Findings of fact are not required where the issue is solely one of law. *White v. State*, 939 S.W.2d 887, 903 (Mo. banc 1997); *Barry*, 850 S.W.2d at 350.

■ Although Edwards claims that the motion court only made findings on five issues, in his brief he only specifies three issues for which findings were not made. First, Edwards complains that the motion court did not address his allegation that trial counsel was ineffective for failing to investigate and present evidence of Edwards' childhood through his mother. A review of the motion court's judgment shows that the court found Edwards' trial counsel provided effective assistance of counsel and conducted an appropriate investigation into Edwards' background. The motion court noted that counsel had multiple visits with Edwards before trial, had three experts evaluate Edwards, and interviewed multiple witnesses. Although the generalized finding that counsel were effective could have applied to many of Edwards' claims, such generalized findings are not fatal where, as here, the motion court clearly considered counsel's effectiveness and the appropriateness of counsel's investigation.

Second, Edwards complains that the motion court did not make specific findings relating to his argument that *Crawford* applied retroactively to his claim that he was denied the right to confrontation. As discussed above, *Crawford* is inapplicable, so a remand to the motion court on this issue would be pointless. Further, this is a question of law and findings of fact are not required.

Third, Edwards claims that the motion court did not make specific findings on the

issue of Wilson's recantation. Since this Court has determined that Edwards did not meet the standard to obtain a hearing on this issue, there would be no point in remanding to the motion court.

**Right to testify at post-conviction hearing**

██ Edwards' fifth point on appeal is that the motion court did not allow him to testify at the Rule 29.15 hearing. At the beginning of the Rule 29.15 hearing, the motion court denied Edwards' handwritten motion for a continuance based on his request for new attorneys, finding that Edwards had received "excellent representation."

When Mildred's testimony during the Rule 29.15 hearing conflicted with her trial testimony, Edwards interrupted to complain that she was lying. The motion court responded, "Mr. Edwards, you'll have the opportunity to make your statements."

At the close of the evidentiary hearing, Edwards' post-conviction counsel notified the court that they still had two depositions to take before submitting the case. The motion court entered an order permitting the depositions to be taken. The following exchange then took place:

> [Mr. Edwards]: Your honor, do I get to say anything on the stand or off the stand? I'd like to testify here today or some time soon, if I can.
>
> The Court: Not at this point. You'll have ample time to discuss whatever you want with your attorneys. Okay.
>
> [Mr. Edwards]: I won't be allowed to testify at all?
>
> The Court: That's not up to me to say. That's between you and your attorneys.
>
> [Mr. Edwards]: I'd like to let the Court know I would like to testify.
>
> The Court: I suggest you convey that thought to your attorneys.

> [Mr. Edwards]: I did and they haven't responded in six months.
>
> The Court: I'm sure they'll address that issue with you.

Nearly five months after this exchange, Edwards' counsel notified the motion court that their presentation of evidence had concluded. At that time, the record was closed.

Edwards relies on Rule 29.15(i), which states, "At any [Rule 29.15] hearing ordered by the court the movant need not be present. The court may order that testimony of movant shall be received by deposition...." Edwards asserts that this rule provides an absolute right to testify, giving the trial court discretion only as to whether to require that testimony by deposition.

The plain language of Rule 29.15(i) does not provide the movant the right to testify. Edwards contends that *State v. Athanasiades*, 857 S.W.2d 337 (Mo.App.1993), holds that the rule provides the absolute right to testify. In that case, the motion court granted a hearing on issues related to ineffective assistance of trial counsel, but limited the witnesses so that only trial counsel could be called. The movant had originally been listed as a potential witness. The court of appeals found that "[t]he motion court abused its discretion in limiting defendant's evidence to the testimony of the attorney that defendant claimed to be ineffective. Defendant should have been permitted to present his own testimony either in person or possibly by deposition." *Id.* at 341.

*Athanasiades* does not recognize the absolute right that Edwards advocates and is factually distinguishable. Here, the motion court did not restrict the witnesses that Edwards could call. The motion court also did not refuse to allow Edwards to testify. Rather, the motion court recognized that this was a matter for post-

conviction counsel to work out with Edwards.

A Rule 29.15 claim is a civil proceeding and is governed by the rules of civil procedure. *Leisure v. State*, 828 S.W.2d 872, 878 (Mo. banc 1992); Rule 29.15(a). Even when a hearing is granted, not all rights guaranteed to a criminal defendant at trial are extended to the Rule 29.15 hearing. There is no right to effective assistance of counsel at a Rule 29.15 hearing. *Winfield v. State*, 93 S.W.3d 732, 738 (Mo. banc 2002). There is no right to confrontation at a post-conviction hearing. *Leisure*, 828 S.W.2d at 878. Edwards does not cite any case law recognizing a constitutional "right" to testify at a post-conviction hearing.

Whether or not to call the defendant to testify at a post-conviction hearing is a matter of trial strategy. In a post-conviction proceeding, unlike a criminal trial, the defendant's choice on this issue does not override counsel's choice. Counsel here appears to have made a strategic decision not to call Edwards to testify. The motion court did not clearly err in closing the hearing upon receiving notification from Edwards' counsel that they were done presenting evidence.

**Ineffective assistance for failing to adequately investigate Edwards' childhood**

Edwards' sixth point is that the motion court erred in finding that his trial counsel was not ineffective for failing to investigate adequately and to present evidence of his "traumatic" childhood at trial.

Specifically, Edwards complains that: (1) although his mother, Mildred, was called to testify in the penalty phase, counsel was not aware of the extent of the domestic violence within the home, Mildred's depression, or the extent of odd behaviors displayed by Edwards as a child;

(2) Edwards' cousin, Tangalayer Mansaw, was not interviewed or called to testify; and (3) trial counsel failed to call an expert who would have diagnosed Edwards with Asperger's Disorder.

The motion court found that trial counsel's penalty phase strategy was to portray Edwards as "an integral, fully functioning and connected member of a good family of decent people." The motion court found that presenting the evidence Edwards now advocates would have been contrary to this strategy because it would have portrayed Edwards and his family as unsympathetic. The motion court found that Mansaw would have added "nothing significant" to the penalty phase and that portraying Mildred as a severely depressed, abused woman who could not properly care for her children would have contradicted the penalty phase strategy.

The motion court found that "counsel did investigate [Edwards'] social history and found nothing to suggest the presence of a mental disease or defect, specifically Asparger's [sic] Disorder," and also that trial counsel was not ineffective for failing to call an expert who would testify that Edwards had this disorder, because "such evidence would have been contrary to the trial strategy" of portraying Edwards as a connected member of a loving family. The motion court found Dr. Draper's opinion to be unreliable because it was reached after meeting with other experts and post-conviction counsel. "[A]s such, the independence of her expert opinion has been so seriously compromised that it carries no weight."

As for Dr. Cross' contentions that he did not receive adequate records to make a pretrial diagnosis, the motion court noted that Dr. Cross never requested additional records, despite being instructed by trial counsel to contact them if he required anything else. The motion court conclud-

ed that "Dr. Cross did not see the necessity for reviewing additional records, because he did not need them in order to diagnose whether or not [Edwards] had Asparger's [sic] Disorder. He did not diagnose Asparger's Disorder until he attended the group discussion ... By Dr. Cross' own admission, he did not originally diagnose Asparger's ... Yet now Dr. Cross blames trial counsel for his failure to diagnose Asparger's Disorder prior to trial even though he administered and graded a series of standardized psychological tests[.]" The motion court concluded that, "based on the fact that his opinion and conclusions were reached only after meeting with [Edwards'] post-conviction relief counsel, ... that the independence of [Dr. Cross'] expert opinion has been so compromised that it carries no weight."

■ To show that his counsel was ineffective, Edwards must demonstrate, first, that his counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, Edwards must show that this deficiency prejudiced him, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Counsel's performance is presumed to be reasonable. *Id.* at 689, 104 S.Ct. 2052. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. In a death penalty case, counsel are expected to "discover all reasonably available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

■ The record supports the motion court's conclusion that a proper investigation was made into Edwards' childhood. Although a "composite" social history was not prepared, meaning that all of the information was not consolidated in one report, trial counsel conducted the interviews that make up the social history and prepared a chronological chart of Edwards' life. None of the three pretrial experts requested a more detailed social history. Counsel interviewed everyone that they were told about by Edwards or his family. Although trial counsel were aware of some domestic violence and other problems, they were not aware of the extent. None of the witnesses interviewed went into detail about the extent of Mildred's depression. Not only was this information not disclosed to trial counsel, it was not disclosed to the experts who were trained to elicit such information from witnesses. Dr. Cross testified that he did not believe that Mildred was capable of revealing this information during the pretrial period. Trial counsel is not ineffective for not discovering the extent of this evidence, when all reasonable interviews were conducted. This information was not "reasonably available" to trial counsel. Counsel made a reasonable investigation into Edwards' background, and nothing in that investigation indicated anything significantly abnormal about Edwards' childhood.

■ To the extent that information indicating a "traumatic" childhood was discovered, counsel made a strategic decision not to present it. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. Trial counsel testified that their strategy was to present Edwards as a contributing member of a loving family. The attorney responsible for the penalty phase was aware

that Edwards did not cry as a child, did not play with other children, showed some obsessive behaviors, and was beaten by his father. She was also aware that Mildred had been depressed and had been abused to some extent by Emmrie. She testified that she chose not to present this information. This strategic decision was reasonable under the circumstances. *See State v. Johnson*, 968 S.W.2d 123, 133 (Mo. banc 1998) (trial counsel was not ineffective for choosing to portray Johnson as "the product of a good Christian family" rather than "the victim of a cold, unloving family"); *Williams v. State*, 168 S.W.3d 433, 443 (Mo. banc 2005) (strategic decision to pursue residual doubt rather than abusive childhood was reasonable because the two defenses would be inconsistent).

The cases cited by Edwards are distinguishable. In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), counsel did not begin its penalty phase investigation until one week before trial. Counsel knew about, but failed to introduce, evidence of borderline intelligence. *Id.* at 396, 120 S.Ct. 1495. Counsel knew about, but did not obtain, available records that showed that Williams' parents were imprisoned for criminally neglecting him, that he had been repeatedly beaten by his father, that he had spent extensive time in foster care, and that his childhood home conditions were extremely unsanitary. *Id.* at 395, 120 S.Ct. 1495. Similarly, in *Hutchison v. State*, 150 S.W.3d 292, 304–06 (Mo. banc 2004), counsel did not spend any time preparing for the penalty phase, did not attempt to obtain known records, did not interview Hutchinson's psychiatrist despite knowledge of chronic psychiatric problems, and retained one expert who did not interview any other witnesses or review records and who spent only three hours with Hutchinson. In contrast, here, one attorney and one staff member were focused on prepar-

ing for the penalty phase throughout the pretrial period, three experts were consulted, and the records that Edwards complains about (Edwards' birth records and Mildred's psychiatric records) were reviewed by counsel and did not contain clearly mitigating evidence.

The United States Supreme Court in *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), held that the trial court could not refuse to consider Eddings' traumatic childhood as a mitigating circumstance. In contrast, the trial court here did not refuse to consider any mitigating evidence that was presented. In *Wiggins*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471, trial counsel failed to conduct a background investigation because they wanted to pursue a residual doubt defense. In contrast, trial counsel here conducted an appropriate investigation and made a reasonable strategic decision based on the information they received from Edwards and his family.

Edwards relies most heavily on *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), where the defendant and his family members testified that there was no mitigating evidence to be found. The defendant refused to cooperate with trial counsel in pursuing a penalty-phase defense. A close reading of *Rompilla* reveals that the main basis for finding trial counsel ineffective was their failure to examine prior criminal history files despite knowing that the State intended to use criminal history as an aggravating factor. *Id.* at 2464. These files contained references to other information that would have alerted trial counsel to the abuse that the defendant had suffered and to prior assessments of mental retardation. *Id.* at 2469. Trial counsel here did not fail to investigate any records that they knew about. The fact that witnesses did not

disclose facts about Edwards' childhood is not the fault of trial counsel.

■ Counsel were not ineffective for failing to call Mansaw because no one mentioned that Mansaw was a possible witness who had lived with the family. Ineffective assistance for failure to call a witness requires the defendant to show: "(1) trial counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense." *Hutchison v. State,* 150 S.W.3d 292, 304 (Mo. banc 2004). Trial counsel did not know about Mansaw, and counsel took all reasonable steps to discover the names of potential witnesses.

■ There also was no clear error in the motion court's failure to find counsel ineffective for not calling another expert. "The selection of witnesses and evidence are matters of trial strategy, virtually unchallengeable in an ineffective assistance claim." *Williams v. State,* 168 S.W.3d 433, 443 (Mo. banc 2005). Counsel is not ineffective for failing to shop for an expert that would testify in a particular way. *State v. Mease,* 842 S.W.2d 98, 114 (Mo. banc 1992). None of the three experts found any significant mental disease that would provide a defense to the crime, and none of them identified any specific developmental disorder that would provide significant mitigation. Trial counsel were not ineffective for failing to consult additional experts.

**Ineffective Assistance for failing to investigate and present evidence of Edwards' mental problems**

■ Edwards' seventh point is that trial counsel failed to conduct a reasonable investigation, which resulted in the trial experts not properly diagnosing Edwards' mental condition, specifically Asperger's

Disorder. As discussed above, trial counsel conducted a sufficient investigation and prepared an adequate social history. The fact that none of the experts asked for more records or a more detailed social history indicates that they did not believe that such information was necessary to a diagnosis.

To show that his counsel was ineffective, Edwards must demonstrate, first, that his counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, Edwards must show that this deficiency prejudiced him, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Counsel's performance is presumed to be reasonable. *Id.* at 689, 104 S.Ct. 2052. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. In a death penalty case, counsel are expected to "discover all reasonably available mitigating evidence." *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

Besides incomplete social history, Edwards' main complaint is that his birth and medical records and Mildred's medical records were not given to the pretrial experts, thus preventing them from making the proper diagnosis. However, the only evidence was that the records were not provided to Dr. Cross, not that they were not provided to the other trial experts. Penalty phase counsel testified that she discussed information contained in those records with both Drs. Stacey and Rabun.

These experts apparently did not find this evidence significant. None of the experts requested additional information, despite being encouraged to do so if necessary.

All of the evidence before the pretrial experts—including school records showing no referrals for psychological services and no significant academic problems, work records showing normal difficulties but also the ability to maintain long-term employment, and significant psychological and intelligence testing and interviews conducted by the experts—did not point to Asperger's or any other significant mental condition that could provide a defense or mitigation. It was reasonable for trial counsel to abandon any possibility of a mental disease defense or mitigation evidence under these circumstances. *See Winfield v. State*, 93 S.W.3d 732, 740–41 (Mo. banc 2002) (counsel did an adequate investigation into Winfield's mental state when the experts opined that he did not have a mental disease or defect); *State v. Mease*, 842 S.W.2d 98, 114 (Mo. banc 1992) (trial counsel satisfied his obligation to investigate mental state when he obtained two expert opinions, of which he had no reason to impugn; the fact that a post-conviction expert gave a different diagnosis does not make trial counsel ineffective).

**Edwards' competence to stand trial**

Edwards' eighth point is that the motion court clearly erred in finding that trial counsel adequately investigated whether he was competent to stand trial. He alleges that counsel were ineffective because they did not seek a competency evaluation.

To show that his counsel were ineffective, Edwards must demonstrate, first, that his counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, Edwards must show that this deficiency prejudiced him, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Counsel's performance is presumed to be reasonable. *Id.* at 689, 104 S.Ct. 2052.

Under Missouri law, "[n]o person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." Section 552.020.1, RSMo 2000.

Edwards is presumed to be competent and bears the burden of proving that he is incompetent. *State v. Anderson*, 79 S.W.3d 420, 432–33 (Mo. banc 2002). A defendant is competent if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (internal quotation marks omitted); *State v. Johns*, 34 S.W.3d 93, 104 (Mo. banc 2000).

None of the three pretrial experts found Edwards incompetent to stand trial or any significant mental disease or defect. Even though counsel had difficulty communicating with Edwards, there was no reason to seek a competency evaluation after receiving the opinion of these experts. The failure to discover a psychiatrist who would find a defendant incompetent to stand trial is not ineffective assistance. *State v. Smith*, 944 S.W.2d 901, 923 (Mo. banc 1997).

Edwards claims that his attorneys did not provide a sufficient social history to

the pretrial experts. As discussed above, the social history investigation was adequate. Even if it were not, however, Edwards does not explain how this evidence would be relevant to a determination of whether, *at the time of trial,* he met the standard for competency.

The record reflects that many of the communication problems were caused by Edwards' desire to control the defense. When counsel did not do what he wanted, he would tell his family not to cooperate or would threaten to withhold the names of witnesses or exculpatory evidence that he claimed to have. When he was pleased with counsel, he would provide information that was useful in preparing the defense. This demonstrates that Edwards was capable of cooperating with his counsel when he chose to do so. While these behaviors may have been frustrating to counsel, and certainly were not always beneficial to Edwards' defense, they were not necessarily irrational or the result of mental incompetence.

Edwards claims that the motion court applied the wrong standard for competency because it only found that he understood the proceedings, but did not find that he was capable of communicating rationally with his attorneys. This assertion is belied by the motion court's judgment. The motion court judge, who was also the trial judge, noted that he had personally observed Edwards throughout the trial, and "at no time did this Court observe any difficulty in communication occurring between [Edwards] and his Trial Counsel." When the judge personally addressed Edwards, he did not appear confused, unresponsive, or disconnected. When Edwards testified, his answers were responsive to the questions asked.

▮ Although Dr. Logan testified, after trial, that he thought that Edwards was incompetent at the time of trial, the motion court did not find this evidence persuasive. This determination was not clear error. Where there is a disagreement among experts, "it is the duty of the trial court to determine which evidence is more credible and persuasive." *Johns,* 34 S.W.3d at 105.

### Edwards' competence at the Rule 29.15 hearing

▮ Edwards' ninth point is that the motion court erred in failing to determine his competence to participate in the Rule 29.15 hearing. Edwards concedes that there is no Missouri case law recognizing the right to a competency determination in a post-conviction hearing. There is no need to decide that issue here because in this case there was no basis for the motion court to believe that Edwards might be incompetent.

▮ "In order to necessitate a *sua sponte* order for a competency hearing, there must be some information, evidence, or observation that triggers the statutory requirement of 'reasonable cause.'" *State v. Tokar,* 918 S.W.2d 753, 763 (Mo. banc 1996); section 552.020.2, RSMo 2000. Post-conviction counsel believed that Edwards was incompetent because they could not communicate effectively with him. However, counsel never requested a competency evaluation. Dr. Logan testified that Edwards was incompetent. As discussed above, there was sufficient evidence that he was competent, including the motion court's own observations. The motion court's determination that there was no basis for ordering a competency evaluation was not clear error.

▮ Alternatively, Edwards argues that the motion court should have granted his motion for a continuance because he and his attorneys had "irreconcilable differences." An irreconcilable conflict exists

where there has been a "total breakdown in communication." *State v. Hornbuckle,* 769 S.W.2d 89, 96 (Mo. banc 1989).

■ As discussed above, the defendant does not have the right, at the post-conviction level, to dictate the specifics of the defense. The fact that his attorneys did not do everything he wanted, and did not allow him to testify, does not indicate a conflict of interest rising to the level of "irreconcilable differences." The record reflects that any difficulties were due to Edwards' voluntary conduct. A defendant may not establish an "irreconcilable conflict" through his own refusal to cooperate. *State v. Owsley,* 959 S.W.2d 789, 793 (Mo. banc 1997).

**Impartiality of trial judge**

■ Edwards' final point on appeal is that the motion court erred in denying his motion for a change of judge based on comments the motion judge made in an unrelated case.

A few days before Edwards' Rule 29.15 hearing, the motion court judge, in an unrelated criminal case, said, "the public defender's office seems to do everything they can to not represent people," and "if they [the public defender's office] want to declare war on me, they've got it." Edwards argues that, because he was represented by the public defender's office, these comments required the judge to disqualify himself. The comments were related to a case involving the local trial division of the public defender's office, whereas Edwards was represented by attorneys from the statewide appellate office. The assigned judge referred the motion to another circuit court judge, who heard arguments and then overruled the motion, finding that these comments did not affect the assigned judge's ability to give Edwards a fair hearing.

■ Although generally it is beneficial for the trial judge to conduct post-conviction hearings, fundamental fairness may require disqualification in some circumstances. *State v. Smulls,* 935 S.W.2d 9, 25 (Mo. banc 1996). Unless there is an abuse of discretion, appellate courts defer to the trial court's determination of whether disqualification is required. *B.R.M. v. State,* 111 S.W.3d 460, 462 (Mo.App.2003). Disqualification is required where "there is an objective basis upon which a reasonable person could base a doubt" about the court's impartiality. *Smulls,* 935 S.W.2d. at 26.

The circuit court did not abuse its discretion in failing to disqualify the motion court judge. The challenged comments were made in connection with an unrelated case and were directed towards a separate division of the public defender's office. These comments did not create an objective basis for a reasonable person to believe that the motion judge could not be impartial in Edwards' case.

The judgment overruling Edwards' Rule 29.15 motion is affirmed.

All concur.