**Kenneth BAUMRUK, Appellant,**

v.

**STATE of Missouri, Respondent.**

No. SC 91564.

Supreme Court of Missouri, En Banc.

April 17, 2012.

Rehearing Denied May 29, 2012.

William J. Swift, Public Defender's Office, Columbia, for Baumruk.

Daniel N. McPherson, Attorney General's Office, Jefferson City, for The State.

ZEL M. FISCHER, Judge.

This is an appeal from the St. Charles County circuit court's judgment overruling Kenneth Baumruk's Rule 29.15 motion for post-conviction relief. This Court previously affirmed Baumruk's guilty verdict on one count of first degree murder and his sentence of death. *See State v. Baumruk,* 280 S.W.3d 600 (Mo. banc 2009) (*Baumruk III* ).

After that appeal, Baumruk filed a Rule 29.15 *pro se* motion for post-conviction relief, and appointed counsel later filed an amended motion. An evidentiary hearing was held on most, but not all, of the claims set forth by the motion. After the evidentiary hearing, the motion court entered findings and a judgment overruling Baumruk's motion. Because a death sentence was imposed, this Court has exclusive jurisdiction over this appeal. Mo. Const. art. V, sec. 10; order of June 16, 1988.

## FACTS[1]

On May 5, 1992, Baumruk and his wife appeared in St. Louis County circuit court for a hearing regarding the dissolution of their marriage. On that day, Baumruk secretly carried two .38 caliber handguns in his briefcase. During the hearing, Baumruk drew both the guns out of his briefcase and opened fire, first on his wife, then her attorney, then his own attorney. Baumruk then shot at Judge Hais, the judge presiding over the case, but Judge Hais escaped through a door behind the bench.

Baumruk, with his weapons still drawn, exited the courtroom into the hallway in

1. Portions of this section are taken or paraphrased from this Court's opinion in *Baumruk* *III* and are used without further attribution.

search of Judge Hais. In the hallway, he shot a bailiff in the shoulder. As his search of the courthouse continued, he fired shots at two police officers; Jim Hartwick, a St. Louis County prosecutor's office investigator; and a security guard. He hit only the security guard. After this, Baumruk was confronted by additional police officers. Baumruk shot at one of these officers and missed; the officers returned fire, hitting Baumruk nine times. Two of these shots hit Baumruk in the head. In total, before Baumruk was subdued by the police, he had shot at nine different individuals, hitting four of them, killing one of those four. The one he killed was his wife.

Baumruk initially was charged with one count of first degree murder and multiple counts of first degree assault and armed criminal action in St. Louis County. However, his motion for change of venue was sustained, and his case was transferred to Macon County. Because of the brain injuries that resulted from Baumruk being shot in the head twice, the circuit court held what would be the first of three hearings regarding Baumruk's competency. Afterwards, the circuit court determined that Baumruk was not competent to stand trial. For this reason, the Macon County circuit court ultimately dismissed the charges against Baumruk after being ordered to do so by this Court in *State ex rel. Baumruk v. Belt,* 964 S.W.2d 443 (Mo. banc 1998) (*Baumruk I* ).

The St. Louis County prosecutor subsequently obtained an 18–count indictment against Baumruk, which included one count of first degree murder for the killing of Baumruk's wife. The St. Louis County circuit court held a second hearing regarding Baumruk's competency in 2000. "The trial court determined that despite the injuries caused by gunshot wounds to his head, Baumruk was now competent to understand and appreciate the proceedings and assist in his own defense." *State v. Baumruk,* 85 S.W.3d 644, 648 (Mo. banc 2002) (*Baumruk II* ). Baumruk again filed a motion to change venue, but this time it was overruled.

In 2001, Baumruk was tried in front of a jury, found guilty, and, in accordance with the jury's recommendation, sentenced to death. He appealed the conviction to this Court, which reversed the judgment and remanded with directions to the St. Louis County circuit court to sustain Baumruk's motion for change of venue. *Baumruk II,* 85 S.W.3d at 651.

The St. Louis County circuit court transferred the case to St. Charles County. In 2005, the St. Charles County circuit court held a third hearing regarding Baumruk's competency. At the conclusion of the hearing, the St. Charles County circuit court determined that Baumruk was competent to stand trial.

In 2007, Baumruk was retried for the murder of his wife. The State presented numerous witnesses who testified about Baumruk's plan to shoot his wife and the execution of that plan. Baumruk presented evidence that he was not guilty because he lacked responsibility by reason of mental disease or defect. He presented the testimony of Dr. Elizabeth Nettles, a psychologist, and Dr. Moisy Shopper, a psychiatrist. Both testified that Baumruk suffered from a delusional disorder. They opined that this mental disease or defect caused Baumruk to have persecutory delusions that the system was against him, that he was singled out, and that the system was corrupt. They also testified that Baumruk's anger and violent behavior were products of this disease. In their opinion, Baumruk did not appreciate the wrongfulness of his conduct and was incapable of conforming his conduct to the requirements of the law.

At the conclusion of Baumruk's defense, the State presented rebuttal evidence through the testimony of two psychiatrists, Dr. Jerome Peters and Dr. John Rabun. Dr. Rabun testified that he found no evidence that Baumruk suffered from delusions or from a mental disease or defect. Instead, Dr. Rabun found that Baumruk's acts were driven by hatred and anger toward his wife and the courts.

At the completion of the guilt phase of the trial, the jury found Baumruk guilty of first degree murder. The jury then was presented evidence during the penalty phase, after which it found several statutory aggravating factors. These factors were that the murder of Baumruk's wife "involved depravity of mind" and "was outrageously and wantonly vile, horrible, and inhuman;" that Baumruk, by his act of murdering his wife, "knowingly created a great risk of death to more than one person by means of a weapon that would normally be hazardous to the lives of more than one person;" and that the murder of his wife was committed while Baumruk was engaged in the attempted commission of eight other unlawful homicides. The circuit court entered judgment imposing the death penalty on Baumruk.

This Court affirmed Baumruk's conviction and sentence in *Baumruk III*, 280 S.W.3d 600.

Baumruk timely filed a *pro se* Rule 29.15 motion, and his appointed counsel filed an amended motion that raised numerous claims and incorporated claims from Baumruk's *pro se* motion. The motion court denied some of the claims without an evidentiary hearing and held an evidentiary hearing on the remaining claims. The court issued a judgment overruling all claims put forth by the motion.

## STANDARD OF REVIEW

■ This Court in "reviewing the overruling of a motion for post-conviction relief" presumes that the motion court's findings are correct. *Zink v. State*, 278 S.W.3d 170, 175 (Mo. banc 2009). For this reason, "[a] motion court's judgment will be overturned only when either its findings of facts or its conclusions of law are clearly erroneous." *Id.*; Rule 29.15(k). Therefore, to overturn the ruling of the motion court on a Rule 29.15 motion, this Court must be left "with a definite and firm impression" that the motion court made a mistake. *Zink*, 278 S.W.3d at 175 (internal quotation omitted).

■ A motion court clearly erred in overruling a Rule 29.15 motion's request for an evidentiary hearing only if movant can show 1) that his motion alleged facts, not conclusions, warranting relief; 2) the facts alleged were "not conclusively refuted by the files and records in the case;" and 3) "the matters complained of ... resulted in prejudice to the movant." *State v. Driver*, 912 S.W.2d 52, 55 (Mo. banc 1995).

■ Baumruk alleges that his competency hearing counsel, trial counsel, and appellate counsel were ineffective for numerous reasons. To succeed on an allegation of ineffective assistance of counsel, Baumruk must show 1) "that his counsel's representation 'fell below an objective standard of reasonableness;'" and 2) "that this deficiency prejudiced him, meaning that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Edwards v. State*, 200 S.W.3d 500, 518 (Mo. banc 2006) (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In making this determination,

Baumruk's counsel's performance is presumed reasonable. *Id.*

## INEFFECTIVE ASSISTANCE OF COMPETENCY HEARING COUNSEL

### First Competency Hearing Counsel Ineffective for Seeking Dismissal of Charges

■ Baumruk argues that the motion court clearly erred in overruling, without an evidentiary hearing, his claim that his first competency hearing counsel was ineffective for ignoring his wishes to remain under the state mental health department's custody and pursuing a writ in *Baumruk I* that sought to have the charges against him dismissed. Baumruk alleges that the dismissal of these charges prejudiced him because it allowed the charges to be refiled in St. Louis County, which resulted in his conviction and, ultimately, his death sentence.

The motion court overruled this claim without an evidentiary hearing because it found that Baumruk's charges had to "be dismissed under the clear mandate of § 552.020.10, RSMo" 1994, as explained in *Baumruk I*, 964 S.W.2d at 447. It also noted that this Court determined in *Baumruk II* that an initial finding that Baumruk was incompetent did not bar a subsequent determination that he was competent to stand trial nor did it bar the State from refiling charges against him. 85 S.W.3d at 648. The motion court, therefore, determined that, regardless of Baumruk's counsel's actions, the State was free to prosecute Baumruk if and when his mental condition improved.

■ Baumruk's argument fails because he cannot demonstrate prejudice. In ad-dressing post-conviction motions, this Court should presume that a motion court acted according to the law. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. As previously determined by this Court in *Baumruk I*, the trial court was required to dismiss the charges against Baumruk once it determined that he was incompetent. 964 S.W.2d at 447. Furthermore, even without Baumruk's counsel actively pursuing dismissal of the charges, the court in which those charges originally were filed would have been able to proceed on them as soon as it determined that Baumruk was competent to stand trial. *Baumruk II*, 85 S.W.3d at 648. The State also was permitted to reraise the issue of Baumruk's competency at any time pursuant to § 552.020.10, RSMo 2000.[2] For these reasons, Baumruk was not deprived of any substantive or procedural right; therefore, he cannot demonstrate that he was prejudiced. *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

### Failure to Move to Suppress Baumruk's Statements Made to Social Worker Buck

Baumruk asserts that the motion court clearly erred in overruling his claim that his counsel was ineffective for failing to move to suppress the statements made by Baumruk to social worker Larry Buck because these statements were obtained in violation of his rights under the Fifth Amendment as set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and the Sixth Amendment as described in *State v. Dixon*, 916 S.W.2d 834 (Mo.App.1995).

During Baumruk's second competency hearing, Buck testified that he was a social

---

**2.** In 1995, the State would have been permitted to reraise the issue of Baumruk's compe-tency pursuant to § 552.020.9, RSMo 1994.

worker in the St. Louis County jail who would meet weekly with Baumruk and other inmates to assess their mental health. These meetings began with general inquiries about how Baumruk was doing in jail and included discussions of how he ended up in jail. During the course of these meetings, Baumruk told Buck that he shot his wife and several other people because he was angry that his wife was going to end up with his house. He also told Buck that he bought the handguns for the shooting when things began to not go his way in the divorce. Baumruk's counsel did not object to some of Buck's notes being entered into evidence, but did object when Buck began to testify regarding Baumruk's motives for shooting his wife on the basis of the therapist/client privilege. This objection was overruled. The transcript from the second competency hearing was subsequently incorporated into the record in Baumruk's third competency hearing.

During Baumruk's trial, Dr. Shopper, one of Baumruk's experts, discussed an incident in which Baumruk accused Buck of extortion for telling Baumruk that if he needed new glasses to have his son purchase them for him. This incident escalated into Baumruk assaulting Buck. Dr. Shopper opined that this incident supported her conclusion that Baumruk suffered from a delusional disorder.

During the State's cross-examination of Dr. Shopper, the State inquired as to whether Dr. Shopper had reviewed the sworn testimony of Buck in forming her opinion and if she recalled that Baumruk told Buck about shooting his wife, two lawyers, and the bailiff, to which Dr. Shopper answered "yes" that was in the transcript she had reviewed. The State used this evidence to demonstrate that Baumruk was feigning his memory loss and delusional disorder.

On redirect, Dr. Shopper testified that Baumruk had no understanding of the consequences of his criminal behavior and, instead, thought that after shooting his wife, he was going to be able to return to Seattle. Dr. Shopper explained that statements like the ones Baumruk made to Buck were consistent with a delusional disorder.

The motion court, in overruling this claim, found that the statements made by Baumruk to Buck were not the product of a custodial interrogation. It further found that any reference to Buck's conversations with Baumruk were made after Baumruk raised the issue of his mental competency by claiming that he was not guilty because he lacked responsibility by reason of mental disease or defect. The court concluded that any objection or motion to suppress the statements would have been overruled.

The United States Supreme Court recently addressed the issue of what constitutes a custodial interrogation of a prisoner and when a prisoner is entitled to a *Miranda* warning in *Howes v. Fields*, 565 U.S. ——, ——, 132 S.Ct. 1181, 1183–84, 182 L.Ed.2d 17 (2012). It found that "[w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation" including "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Id.* at ——, 132 S.Ct. at 1192. "Taking into account all of the circumstances of [Howes'] questioning," the United States Supreme Court determined that Howes "was not in custody within the meaning of *Miranda.*" *Id.* at ——, 132 S.Ct. at 1194. This determination was based on the undisputed fact that Howes was free to end the questioning at any time and request to be returned to his cell. *Id.*

Missouri courts have made the same determination that "[a] defendant's status as a prison inmate does not necessarily make an interview by prison officials 'custodial interrogation' requiring the protections set out in *Miranda.*" *State v. Brown,* 18 S.W.3d 482, 485 (Mo.App.2000). Instead, when a prisoner is questioned, "the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him must be considered to determine whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting." *Id.* Nothing in the record indicates that Buck's interviews took place in a coercive atmosphere or that any coercive questioning techniques were used. Like in *Howes,* the record is clear that Baumruk was in no way forced to meet with Buck and could choose not to attend or to leave the meeting at any time. At the Rule 29.15 evidentiary hearing, Buck testified that it was completely up to Baumruk whether he decided to talk about a subject or answer a question. The record also shows that Baumruk, on at least one occasion, completely ignored his regularly scheduled meeting with Buck. The motion court did not clearly err in determining that these statements were not obtained in violation of *Miranda.*

Baumruk also asserts a violation of his Sixth Amendment right to counsel. In *Dixon,* the court of appeals held that, prior to an interview, a social worker was "obligated to heed the same procedural safeguards as those imposed on the prosecutor and the police." 916 S.W.2d at 837. It found that a social worker failed to heed these procedural safeguards by directly questioning Dixon regarding the al-

legations against him without notifying his attorney; therefore, the social worker acted in violation of Dixon's Sixth Amendment right to counsel. *Id.* "Once an accused invokes his Sixth Amendment right to counsel, the state cannot subsequently initiate an interrogation of the accused unless his or her attorney is present or has been notified." *Id.*

The current case is distinguishable from *Dixon* in at least two ways. In *Dixon,* the statements made by Dixon were used during trial as evidence that Dixon committed the crime for which he was charged. *Id.* at 835. In the current case, Buck only testified during the second competency hearing, the transcript of which was incorporated into the third competency hearing. His statements were not introduced by the State during its case in chief. While Baumruk argues that the expert testimony at trial brought in some of the statements he made, these statements were not introduced with regard to whether Baumruk shot his wife. It was undisputed that Baumruk shot his wife. Instead, the transcript of Buck's testimony was injected by Baumruk through the testimony of defense expert, Dr. Shopper, when she discussed the incident in which Baumruk accused Buck of extortion and Baumruk's subsequent assault of Buck.

Baumruk's case is also distinguishable from *Dixon* in that the record in Baumruk's case refutes any claim that his counsel had not been notified of the meetings between Baumruk and Buck. To the contrary, the record reflects that Baumruk's counsel was well aware of Buck's interviews with Baumruk and hoped that Buck would testify on Baumruk's behalf in the penalty phase.[3] Therefore, this Court finds that the motion court did not clearly err by overruling Baumruk's claim that his

---

**3.** This hope was not realized after Baumruk assaulted Buck.

counsel was ineffective for failing to assert a Sixth Amendment violation of his right to counsel.

### Failure to Move to Suppress Baumruk's Statements to Officer Glenn

■ Baumruk alleges that the motion court clearly erred by overruling his claim that his counsel was ineffective for failing to move to suppress Baumruk's statements to Officer Stewart Glenn. These statements were made to Glenn during the course of an investigation that was initiated after Baumruk filed a complaint that someone was stealing his newspapers. Glenn testified during Baumruk's second competency hearing that he did not go to the jail with the intent of obtaining any information other than that related to the newspaper complaint; however, during the course of this conversation, Baumruk volunteered that he had been shot nine times. Glenn responded by asking what happened. Baumruk told Glenn that he shot his wife in the courtroom, but did not remember doing so. Baumruk later told Glenn that he shot her "when she crunched her lips." This testimony was used by Dr. Rabun, the State's expert, to support his conclusion that Baumruk had some memory of the shootings and was competent to stand trial.

Baumruk claims that his counsel was ineffective for failing to file a motion to suppress the statements he made to Glenn. He claims that the admission of such statements violated his *Miranda* rights because they were made during a custodial interrogation. *Miranda*, 384 U.S. 436, 86 S.Ct. 1602. He argues reasonable counsel would

have moved to suppress these statements and prohibit Dr. Rabun from analyzing them in his expert testimony. He asserts not doing so was not a reasonable strategic decision by counsel even though counsel wished to rely on Baumruk's missing newspaper preoccupation as evidence of his delusional disorder.

After an evidentiary hearing, the motion court overruled this claim because it found that Baumruk did not suffer any prejudice from his counsel's failure to file a motion to suppress Glenn's testimony. It based this determination on the fact that Baumruk previously had filed a motion to suppress the same testimony.[4] Counsel is not ineffective for failing to file a meritless motion. *State v. Hunter*, 840 S.W.2d 850, 870 (Mo. banc 1992).

### Current CT and PET Scans

■ Baumruk argues that the motion court clearly erred in overruling, without an evidentiary hearing, his claim that his counsel was ineffective for failing to obtain more recent computed tomography (CT) and positron emission tomography (PET) scans because such scans would have shown that Baumruk was incompetent to proceed. He argues that more recent CT and PET scans would show that the areas of his brain damaged were responsible for executive decision making and controlling impulsivity. He argues that without these areas functioning properly, he was incompetent to proceed.

In overruling Baumruk's request for an evidentiary hearing on this matter, the motion court found that the record contained ample evidence of the brain injuries he suffered. It also found that Baumruk's

---

4. During the first trial, the circuit court determined that Baumruk's *Miranda* rights were not violated by his interview with Glenn. In 2006, Baumruk filed a second *pro se* motion to suppress the statements he made to Glenn. In 2007, the State agreed not to present Glenn's testimony but still presented Dr. Rabun's analysis of the statements made by Baumruk to Glenn.

claim that the scans would explain the actual effect of his brain injuries was refuted by the record. In conclusion, it found that "[t]he scans would not have any probative value in any phase of this case, would be speculative, and would be cumulative to evidence already presented."

The motion court did not clearly err in determining that this claim was refuted by the record. The record shows that the scans would not demonstrate that Baumruk was incompetent. Dr. Bruce Harry, a psychiatrist, testified that to understand the effects of Baumruk's brain injury would require an actual examination of him, the continued collection of information about him, and the linking together of this information and the examination, not merely new CT and PET scans of his brain.

Baumruk also does not allege sufficient facts in his motion to show that performing new CT and PET scans on him would have led the circuit court to find him incompetent to proceed. The circuit court in the competency hearing heard evidence from multiple experts regarding Baumruk's competency including testimony regarding the effects of Baumruk's brain injuries. The record shows that CT or PET scans would be cumulative evidence and, therefore, not a sufficient basis for a finding of ineffective counsel. *Forrest v. State*, 290 S.W.3d 704, 709 (Mo. banc 2009).

Baumruk also claims that the motion court clearly erred by overruling his motion requesting that the court order new CT and PET scans because such scans would have supported the allegations underlying Baumruk's Rule 29.15 motion. Because Baumruk's motion does not contain sufficient allegations to establish the need for these scans and the allegations it

does make regarding the scans are refuted by the record, the motion court did not clearly err in overruling this motion.

### Failing to Call Dr. Fisher and Dr. Perkowski at Competency Hearing

■ Baumruk claims that the motion court clearly erred in overruling his claim that his counsel was ineffective for failing to call Dr. Linda Fisher and Dr. Les Perkowski as witnesses during his third competency hearing. Dr. Fisher was the chief physician for the St. Louis police department, who specialized in internal medicine. After examining Baumruk in 1993, she believed that Baumruk's memory deficits were permanent and that he had no real memories of the shooting. Dr. Perkowski was the staff psychiatrist at Fulton State Hospital in 1994; he diagnosed Baumruk with dementia caused by head trauma. Baumruk claims that his counsel's choice not to call these witnesses was not a reasonable trial strategy because, as disinterested witnesses,[5] their testimony would have been more credible than the expert witnesses that his counsel chose to have testify.

■ The motion court found that the testimony of Dr. Fisher and Dr. Perkowski would not have provided Baumruk with a viable defense. It also found that their testimony would have been cumulative, not probative of Baumruk's incompetence, and would have impeached the testimony of Baumruk's other experts regarding his condition. The motion court also recognized that Baumruk's condition had changed since 1994, which made both doctors' testimony less probative. "The choice of witnesses is ordinarily a matter

5. Baumruk's assertion that of these witnesses would be disinterested is questionable but ir-

relevant to the resolution of his argument.

of trial strategy and will not support an ineffective assistance of counsel claim." *Strong v. State*, 263 S.W.3d 636, 652 (Mo. banc 2008) (*Strong II*). During the evidentiary hearing on Baumruk's motion, his counsel testified that they chose not to call Dr. Fisher because her specialty was in internal medicine, not psychiatry, psychology, or neurology like the other experts they chose to call. As for Dr. Perkowski, Baumruk's counsel chose not to call him because his testimony was contrary to the other experts whom they intended to call in that Dr. Perkowski had diagnosed Baumruk with dementia in 1994 while more recent examinations of Baumruk by other experts had determined that he did not have dementia but, instead, had a delusion disorder. Strategic decisions, such as the ones made by Baumruk's counsel here, made after thorough investigation are virtually unchallengeable. *Id.* The motion court did not clearly err in determining that Baumruk's counsel's strategic decisions not to call Dr. Fisher and Dr. Perkowski were reasonable.

## INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING GUILT PHASE

### Failure to Object to Dr. Kane's Testimony

Baumruk alleges that the motion court clearly erred by overruling his claim that trial counsel was ineffective for failing to object to Dr. Alex Kane's testimony of a statement Baumruk made to him. He argues that his counsel had no strategic reason for failing to object to this statement as being privileged under § 491.060.5.

The State called Dr. Kane during the guilt phase of Baumruk's trial to testify about the statement made by Baumruk in the emergency room after he was admitted for treatment of the nine gunshot wounds he received during his apprehension. Dr. Kane testified that, as part of his assessment of Baumruk, he attempted to determine if Baumruk could talk by asking him an open-ended question. While Dr. Kane could not remember the exact question, he testified that it was something to the nature of "what happened?" Baumruk responded with the statement that he "wanted to shoot that bitch" due to "divorce." Dr. Kane testified that he remembered these quoted remarks because "it was very memorable and remarkable to me that despite being under the obvious stresses of multiple wounds this man was expressing great vehemence and coldness about having reached a conclusion to something." Baumruk's counsel did not object to this testimony. Dr. Kane also testified as to his treatment of Baumruk.

After an evidentiary hearing on the matter, the motion court overruled this claim because it found that Baumruk's statement was not confidential information necessary for treatment. It also found that Baumruk had waived his right to assert the privilege by putting his mental health at issue by claiming he was not guilty by reason of mental disease or defect. The court concluded that counsel had a strategic reason for allowing the admission of the statement and that counsel was not ineffective for failing to object to Dr. Kane's testimony on the ground of privilege.

Section 491.060.5, RSMo 2000, prohibits a physician from testifying to any information obtained from a patient that was necessary to enable the physician to prescribe and provide treatment for the patient. It states that a physician is incompetent to testify "concerning any information which he or she may have acquired from any patient while attending the patient in a professional character, and which information was necessary to enable him

or her to prescribe and provide treatment for such patient as a physician...."

In order for Baumruk to demonstrate that the motion court clearly erred by not finding his counsel ineffective for failing to object, he must be able to show that if the objection was made, it would have been meritorious. *Zink*, 278 S.W.3d at 188. Baumruk cannot show that an objection based on physician-patient privilege would have been successful because he waived any such claim of privilege by placing his mental condition at issue by arguing at trial that he was not guilty by reason of mental disease or defect. *State v. Carter*, 641 S.W.2d 54, 57 (Mo. banc 1982). Therefore, the motion court did not clearly err in overruling this claim.

### Failure to Move to Suppress Baumruk's Statements to Officer Salamon

Baumruk alleges that the motion court clearly erred in overruling his claim that counsel was ineffective for failing to move to suppress statements made by Baumruk to Officer Steven Salamon, one of the police officers who arrested Baumruk. During the guilt phase of Baumruk's trial, Salamon testified that while he was handcuffing Baumruk, Baumruk asked him, "Officer, did I get her, did I kill her?" Salamon responded to Baumruk's question that he did not know. Baumruk then stated, "God, I hope so." Baumruk claims that Salamon obtained this statement by interrogating him prior to reading him his *Miranda* rights.

After an evidentiary hearing, the motion court overruled this claim because it found that the record made it clear that Baumruk's statement was unsolicited and not the product of a custodial interrogation. It concluded that a motion would have been overruled if filed.

To trigger the requirements of the *Miranda* warnings, a suspect must not only be in custody, but the "questioning must be initiated by law enforcement officers." *State v. Glass*, 136 S.W.3d 496, 510 (Mo. banc 2004). Voluntary statements are not the product of interrogation and, therefore, are not barred by the Fifth Amendment or *Miranda*. *Gregg v. State*, 446 S.W.2d 630, 632 (Mo.1969).

Baumruk argues that his statements to Salamon were not voluntary. He claims that Salamon asked him about the shootings with the hopes of getting a dying declaration from him. He attempts to support this assertion with the testimony of Officer Robert Perry, who stated in his police report written on the day of the shooting that this is what Salamon hoped to do. During the Rule 29.15 evidentiary hearing, Perry stated that he could not recall whether he even took a statement from Salamon. Instead, he could only confirm that his report indicated that he had. Salamon denied making the statement in Perry's report.

The motion court was presented with both the testimony of Salamon and Perry. Compared with this Court, the lower court had "a superior opportunity to judge the credibility" of both Salamon and Perry. *Clayton v. State*, 63 S.W.3d 201, 209 (Mo. banc 2001). This Court, therefore, will defer to the motion court's determination that Baumruk's statement to Salamon was voluntary. *Id.* Accordingly, Baumruk's counsel cannot be ineffective for failing to file a meritless motion. *Hunter*, 840 S.W.2d at 870.

### Failure to Impeach Dr. Rabun

Baumruk claims that the motion court clearly erred in overruling his claim that his counsel was ineffective for failing to impeach Dr. Rabun with the fact that when he first gave his opinion on Baum-

ruk's mental state, Dr. Rabun's divorce was pending before Judge Hais. He claims that if his counsel would have cross-examined Dr. Rabun on this, it would have shown Dr. Rabun's bias towards holding unfavorable opinions regarding Baumruk.

Dr. Rabun was called by the State as a rebuttal witness to Baumruk's not guilty by reason of mental disease or defect defense. Dr. Rabun had examined Baumruk three times prior to being called. He examined Baumruk in 1994 and concluded that Baumruk "was not suffering from any psychiatric diagnosis." In 1999, he examined him again and diagnosed him with "an amnestic disorder due to his head trauma." In 2000, Dr. Rabun was ordered to evaluate Baumruk's mental responsibility at the time of the offense. After an investigation, which included the review of numerous documents and interviews, Dr. Rabun vacated his amnestic disorder diagnosis and again found that Baumruk was not suffering from any mental disorder. Dr. Rabun concluded that Baumruk's shooting of his wife in the courtroom demonstrated planning for the most opportune time to carry out his acts against her and the others involved in the divorce case.

After an evidentiary hearing, the motion court overruled Baumruk's claim because it found that, even though Dr. Rabun's dissolution was in front of Judge Hais, the dissolution was uncontested and, therefore, would have no impeachment value. It also concluded that there was not "even a slight possibility of a different result" had counsel cross-examined Dr. Rabun about his uncontested dissolution that occurred 11 years prior to Baumruk's most recent trial.

 The failure to impeach a witness does not "constitute ineffective assistance of counsel unless such action would have provided a viable defense or changed the outcome of trial." *State v. Ferguson*, 20 S.W.3d 485, 506 (Mo. banc 2000). Baum-

ruk does not allege that the impeachment would have provided a viable defense. That being so, this Court must only determine if the motion court clearly erred in determining that impeachment of Dr. Rabun regarding his uncontested dissolution would have changed the outcome of the trial. This Court does not believe that the motion court clearly erred in determining that it would not.

## INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING PENALTY PHASE

### Failure of Counsel to Seek Disqualification of Prosecutor

 Baumruk alleges that the motion court clearly erred in overruling, without an evidentiary hearing, his claim that counsel was ineffective for failing to move to disqualify the St. Louis County prosecutor's office (STLCPO). He claims that he was prejudiced by this failure because Hartwick, one of the nine persons at whom Baumruk shot, was an investigator for STLCPO and Hartwick's wife was a STLCPO attorney. He claims that this prevented the STLCPO from acting objectively and without personal bias in pursuing the death penalty against Baumruk.

The motion court overruled this claim without an evidentiary hearing because, relying on the evidence presented to it during the hearing on Baumruk's motion to disqualify the STLCPO from the Rule 29.15 proceedings, it determined that Baumruk's trial counsel was not ineffective for failing to file a similar motion prior to his trial because he could not demonstrate conflict or prejudice. The evidence presented showed that Hartwick left the STLCPO prior to Baumruk's first trial and that neither Hartwick nor his former wife had any meaningful participation in the

investigation or prosecution of Baumruk. While Hartwick did obtain copies of recordings from the courthouse security cameras from the day of the shooting, this was nothing more than a clerical act. The motion court concluded that any objection or claim of conflict on the part of the STLCPO would have been overruled; therefore, counsel cannot be effective for failing to make a meritless motion or objection.

▮ "Failure to seek unwarranted relief does not constitute ineffective assistance of counsel." *State v. Redman*, 916 S.W.2d 787, 793 (Mo. banc 1996). The record refutes Baumruk's claim that the disqualification of the prosecutor was warranted; therefore, Baumruk has failed to meet his burden of affirmatively proving prejudice. *Adkins v. State*, 169 S.W.3d 916, 920–21 (Mo.App.2005) (citing *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052). Even if Baumruk is correct that the STLCPO should be disqualified, "prejudice likely does not lie." *Id.* at 921. Speculation that a different prosecutor may not have requested the death penalty does not meet the requirement of demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

### Failure to Move to Suppress Baumruk's Statements to Officer Venable

▮ Baumruk argues that the motion court clearly erred by overruling his Rule 29.15 claim that his counsel was ineffective for failing to move to suppress the statements that Baumruk made to Corrections Officer Robert Venable after Baumruk struck Trina Bland, a medical assistant.

Baumruk claims that Venable questioned him regarding an incident in which he assaulted Bland without first giving him a *Miranda* warning. Venable testified during the penalty phase of Baumruk's trial that he had been called to the clinic in the immediate aftermath of Baumruk's assault on Bland. Venable questioned Baumruk regarding the incident, asking him why he had assaulted Bland. Baumruk responded that she had lied to him about changing the dressings of a wound on a daily basis. Venable inquired further, "So, that's why you assaulted a woman?" To which Baumruk responded, "Yes, that's right. *I killed once and I would do it again.*"

After an evidentiary hearing, the motion court overruled this claim because it found that Venable's question was not an interrogation and the trial court's admission of the statement did not violate *Miranda*. It also determined that trial counsel had a strategic reason for allowing this testimony.

Baumruk's trial counsel made the strategic decision to defend their client on the basis that he was not guilty by reason of mental disease or defect. As part of this defense, trial counsel sought to present evidence of Baumruk's diagnosis of a delusional disorder. This evidence included Dr. Shopper's testimony regarding Baumruk's delusional thinking. One example that Dr. Shopper presented was that Baumruk had attempted to discharge his counsel because they declined to call the doctor responsible for overseeing Baumruk's care to testify that Bland was not following that doctor's directions regarding changing the dressing of his wound.

The strategic decision to defend Baumruk on the basis that he had a mental disease or defect was "made after thorough investigation of law and facts relevant to plausible options" by Baumruk's counsel and is, therefore, virtually unchal-

lengeable. *Strong II*, 263 S.W.3d at 652 (internal quotations omitted). His counsel testified during the postconviction relief hearing that they considered a motion to suppress Baumruk's statement to Venable but decided against it because Venable's testimony was going to be mentioned by Baumruk's experts anyway. Because trial strategy is not a ground for ineffective assistance of counsel, the motion court did not clearly err in overruling this claim. *Id.*

**Cross–Examination of Officer Venable**

■ Baumruk claims that the motion court clearly erred in overruling, without an evidentiary hearing, his claim that his counsel was ineffective for cross-examining Venable during the penalty phase as to whether Baumruk's jail file showed violent behavior prior to his assault of Bland. Baumruk claims that this question allowed Venable to testify about an incident where Baumruk stabbed a social worker[6] with a pencil.

After Venable testified regarding Baumruk's assault on Bland, Baumruk's counsel attempted to impeach this evidence by asking Venable if there was anything in Baumruk's file indicating that he had previously been violent within the jail. Venable answered:

> I don't think there was anything current. In the past he had been violent in the facility. I'm aware of at least one incident where he stabbed a social worker with a pencil, a lead pencil. At the time that this incident occurred it was not in his file.

Though a portion of this answer was non-responsive to the question asked, no objection was made.

The motion court overruled the request for an evidentiary hearing on this claim

because it found that it was refuted by the trial transcript. The court noted that counsel's question only inquired as to whether Baumruk's file reflected any violent behavior prior to the assault on Bland, not whether Venable had any recollection of any other violent behavior. Further, it noted that an objection by counsel to the answer as non-responsive would have risked highlighting the answer to the jury.

■ "Defense counsel cannot be ineffective for attempting to impeach the state's witness and receiving a nonresponsive statement." *State v. Shurn*, 866 S.W.2d 447, 469–70 (Mo. banc 1993). As the motion court recognized, it was reasonable strategy for Baumruk's counsel to not object to this response in order to avoid highlighting this incident to the jury. *See State v. Tokar*, 918 S.W.2d 753, 768 (Mo. banc 1996).

**Failure to Call Worchester**

■ Baumruk alleges that the motion court clearly erred by overruling, without an evidentiary hearing, his claim that his counsel was ineffective for failing to present evidence that Baumruk told Austin Worchester, an emergency medical technician, that he was sorry. Baumruk made this statement as he was drifting in and out of consciousness in the ambulance on the way to the hospital after he sustained his nine gunshot wounds. Baumruk argues that his counsel should have presented this evidence during the penalty phase of trial to rebut the State's evidence that cast Baumruk as an unremorseful "jerk."

The motion court overruled this claim without a hearing because it found that Worchester could not offer any testimony that would withstand a hearsay objection.

**6.** This incident was when Baumruk stabbed Buck.

Baumruk is not entitled to an evidentiary hearing on this ground because, even if the facts he alleges in the motion regarding Worchester's testimony were true and were not inadmissible hearsay as determined by the motion court, he still cannot demonstrate that the failure of his counsel to present this evidence caused him prejudice. Even if this Court were to presume that the vague statement that Baumruk made to Worchester meant that he was sorry for killing his wife, the overwhelming evidence still shows that he was unremorseful. Dr. Kane, Dr. Rabun, Salamon, Dr. Shopper, and Venable all testified that Baumruk was not remorseful about killing his wife. Worchester's testimony would have contradicted the testimony of Dr. Shopper, who was Baumruk's own witness. The aggravating factors as found by the jury are such that no reasonable probability exists that the outcome of the penalty phase would have been different. *Zink*, 278 S.W.3d at 176.

### Failure to Present Expert Testimony Utilizing Available CT Scans

■ Baumruk claims the motion court clearly erred in overruling his claim that his counsel was ineffective for failing to call an expert to testify as to the precise areas of Baumruk's brain damage and how these injuries affected Baumruk's executive decision making and ability to control impulsivity by analyzing Baumruk's pre- and post-surgery 1992 CT scans. Baumruk claims that this evidence could have explained his post-shooting negative behaviors and been utilized as a mitigating factor.

After evidentiary hearing, the motion court overruled this claim after finding that a number of medical experts testified during trial about the brain injuries that Baumruk suffered in his shoot-out with the police and that "[t]he introduction of the CT scans would not have altered the outcome of the penalty phase." The court found that counsel had discussed presenting the evidence but decided that it would not mitigate punishment because Baumruk was shot in the head only after firing on a uniformed officer.

The motion court did not clearly err in making these findings. As previously described, Dr. Harry testified that the CT and PET scans were insufficient to help the jury understand how Baumruk would be affected by his brain injuries. The record also supports the motion court's finding that it was a strategic decision by Baumruk's counsel not to present this evidence because it would open the door to more evidence of the shoot-out with police that caused the injuries. Baumruk's counsel testified that they thought the mitigating value of such evidence would be limited and that the evidence might, instead, be aggravating. The motion court also noted that this evidence had been presented in Baumruk's first trial to no avail and, therefore, it was a reasonable strategic decision for Baumruk's counsel to present different mitigating evidence during Baumruk's second trial.

Baumruk's argument relies on *Hutchison v. State* for the proposition that "evidence of impaired intellectual functions is inherently mitigating . . . ." 150 S.W.3d 292, 308 (Mo. banc 2004). However, *Hutchison* is distinguishable in that Hutchison had had mental problems his entire life, including bipolar disorder, attention deficit hyperactivity disorder, and alcoholism. *Id.* at 302. Such circumstances were mitigating because they showed that Hutchison was a "follower" and less culpable than the other participants in the killing in question. *Id.* at 303. In the current case, the CT scans that Baumruk claims his counsel should have presented would only demonstrate his mental problems after the shoot-

ing. Also, unlike Hutchison, Baumruk planned and executed the murder of his wife on his own.

### Failure to Present Evidence of the Impact of "Life Stressors"

█ Baumruk claims that the motion court clearly erred in overruling, without an evidentiary hearing, his claim that counsel was ineffective for failing to present expert testimony during the penalty phase regarding the numerous life stressors Baumruk was facing at the time of the shooting including the dissolution action itself, the death of his mother, and the relocation to a new job in Seattle. Baumruk claims that an expert could have testified that these stressors left him with an overwhelming sense of rejection and betrayal, which would have served as mitigating evidence.

In overruling Baumruk's request for an evidentiary hearing, the motion court noted that both Dr. Nettles and Dr. Shopper testified in the guilt phase to their opinions regarding how the divorce proceeding and the other stressors in Baumruk's life related to his mental state at the time of the killing of his wife. The court also noted that Baumruk's counsel cross-examined both Dr. Peters and Dr. Rabun about Baumruk's anger and other emotions resulting from the dissolution. The motion court found that to permit another expert during the penalty phase to reiterate evidence already heard by the jury would have been unnecessary.

The motion court did not clearly err in making this ruling because Baumruk failed to plead facts showing that he was entitled to relief. The failure to produce cumulative evidence is not a sufficient basis for a finding of ineffective assistance of counsel. *Forrest*, 290 S.W.3d at 709. In order to demonstrate that Baumruk was not guilty by reason of mental disease or defect, his counsel presented the testimony of Dr. Shopper and Dr. Nettles that Baumruk suffered from delusional disorder that created beliefs that the system was rigged against him, that he would therefore lose his house in the divorce, and that he was justified in taking action to prevent that from happening. The fact that counsel did not call another witness during the penalty phase to provide more testimony about these life stressors was a trade-off trial counsel was in the best position to assess. *See Strong II*, 263 S.W.3d at 652 ("The choice of witnesses is ordinarily a matter of trial strategy and will not support an ineffective assistance of counsel claim.")

### Failure to Call Treating Nurses Gast and Johns

█ Baumruk claims that the motion court clearly erred in overruling his claim that his counsel was not ineffective for failing to call two Barnes Hospital treating nurses, Catherine Gast and Cathy Johns. He claims that these nurses would have testified that patients with head injuries such as Baumruk can be belligerent as a result of their injuries. Baumruk claims that this testimony would have neutralized the State's aggravating evidence about Baumruk's belligerent behavior toward Regional Hospital nurse Lisa Williams.

The motion court overruled this claim because it found that Baumruk's counsel had investigated the use of both Gast and Johns as witnesses but had made the reasonable strategic decision that they would not provide useful testimony.

During the guilt phase, Dr. Rabun testified that Baumruk grabbed Williams' arm because he felt she was not doing her job properly. Baumruk then told her that she deserved the same thing as his wife. Williams, however, was not called to testify. Baumruk's counsel testified that, while they had interviewed both Gast and Johns

and investigated whether to call them as witnesses, they decided not to when they learned the State was not going to call Williams.

■ "The choice of witnesses is ordinarily a matter of trial strategy and will not support an ineffective assistance of counsel claim." *Id.* Strategic decisions such as the one made by Baumruk's counsel here after thorough investigation are virtually unchallengeable. *Id.* Baumruk's counsel had unfettered discretion in making the determination of what witnesses to call. *Id.* at 653. Therefore, the motion court did not clearly err in determining that Baumruk's counsel's strategic decision not to call Gast and Johns was reasonable; therefore, his counsel was not ineffective.

### Repeated Slide Show During Closing Argument of Penalty Phase

■ Baumruk alleges that the motion court clearly erred by overruling his claim that his trial counsel was ineffective for failing to make a complete record of their objection to the repeated slide show shown to the jury during the State's closing argument.

The repeated slide show, which Baumruk claims was prejudicial to him, consisted of 11 photographs. Each of the 11 photographs was admitted into evidence prior to the showing of the slide show. Four of the photographs were of Baumruk's wife, by herself or with one of her two daughters. Juxtaposed with these photographs were three pictures of Baumruk's wife slumped over in a courtroom chair with blood on her face and neck. There were three photographs of Baumruk's wife's grandchildren. Baumruk's counsel objected to these photographs prior to their admission on the grounds that they were improper victim impact evidence because the grandchildren in them were born after Baumruk's wife's death. The

trial court overruled this objection. The final photograph was of Baumruk himself.

During the State's closing argument, Baumruk's counsel objected to the slide show stating that he was sorry but:

At this point, your Honor, I'm going to object. I want the record to reflect that while [the prosecuting attorney] is going through his closing argument there is a nice little slide show that's going on behind him that's showing various pictures of the victim's family, showing [Baumruk's wife], various State's exhibits that have been admitted into evidence, pictures of the courtroom. And I anticipate that they will keep on flashing up as he goes through closing argument. I would object to that, and I would at the very least want the record to reflect that this was going on.

The court stated that the record would so reflect and asked the State if it had a response. The State responded: "I didn't know if there was a legal objection, Your Honor. All I can say is these, every one of these exhibits is in evidence and has been available for the jury and they've all viewed them." The court overruled the objection and let the State proceed with its argument. Baumruk's counsel also included a claim in his motion for new trial that the trial court erred in overruling this objection.

Baumruk claimed in his Rule 29.15 motion that reasonable counsel, who objected like his counsel did to the slide show, would have made the slide show part of the record. In overruling the claim, the motion court concluded that raising the issue on appeal would not have entitled Baumruk to relief. The motion court noted in its findings of facts that

[it had] reviewed the photographs as they played during the closing portion of the State's case and finds no errors. [It

also noted that it] reviewed the transcript of the State's closing argument and [found] the photographs corresponded with the victim impact portions of the presentation. While choreographing of words and photographs may not have been to [Baumruk's] satisfaction, from a review of the entire record, it is clear that the statements and photographs were supported by the evidence adduced at trial, were relevant and probative to the issues presented and did not prejudice [Baumruk]. Any further objection or preservation of the issue for appeal would not have resulted in [Baumruk] receiving relief.

As the motion court correctly found, Baumruk's counsel could not be ineffective for failing to preserve a non-meritorious argument. *Hunter*, 840 S.W.2d at 870.

 Baumruk also claims the motion court clearly erred in overruling his claim that his appellate counsel was ineffective for failing to raise the issue of the slide show on direct appeal. While "[a] defendant is entitled to effective assistance of appellate counsel," appellate counsel has "no duty to raise every possible issue asserted in the motion for new trial on appeal, and no duty to present non-frivolous issues where appellate counsel strategically decides to winnow out arguments in favor of other arguments." *Storey v. State*, 175 S.W.3d 116, 148 (Mo. banc 2005). In the current case, Baumruk's appellate counsel testified that she decided not to present this issue on appeal because she could not effectively argue that the trial court erred in allowing the slide show to be presented by the State. Because, "[t]he trial court has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment," *State v. Strong*, 142 S.W.3d 702, 720 (Mo. banc 2004) (*Strong I*), it is likely that Baumruk's

counsel was correct in her assessment that such an argument would have been unsuccessful. In *Strong I*, this Court held that a similar slide show, consisting of photographs, nearly all of which were previously admitted, was not more prejudicial than probative and, therefore, "[t]he trial court did not abuse its discretion in permitting the state to display a slide show to the jurors during the penalty phase." *Id.* at 721. In cases such as the current one, "[g]ruesome crimes produce gruesome, yet probative, photographs, and a defendant may not escape the brutality of his own actions." *Id.* (internal quotations omitted).

 Baumruk's final claim regarding the slide show is that that the motion court clearly erred in overruling his claim of ineffective assistance of appellate counsel without making findings of fact and conclusions of law on all issues. However, the motion court's finding of fact on this claim is sufficient to permit appellate review and, therefore, does not violate Rule 29.15(j). Rule 29.15(j) requires a motion court to enter "findings of fact and conclusions of law on all issues presented" pursuant to Rule 29.15(j). The rule, however, does not require the motion court "to individually address every claim brought by the movant." *Edwards*, 200 S.W.3d at 513 (internal quotations omitted). Instead, "[g]eneralized findings are sufficient so long as they permit the appellate court an adequate record for appellate review of movant's claims." *Id.* In this case, the motion court found that the trial court did not err by allowing the slide show to be played and also that any further objection or preservation of the issue for appeal would not have resulted in Baumruk obtaining relief. This is sufficient to preserve the error of whether appellate counsel was ineffective.

## CONCLUSION

For the foregoing reasons, the judgment is affirmed.

TEITELMAN, C.J., RUSSELL, BRECKENRIDGE, STITH and PRICE, JJ., and MESLE, Sp.J., concur.

DRAPER, J., not participating.